Good morning, may it please the court. Good morning. My name is Dylan Hastings from the law firm of William Cedar and I represent the appellant in this matter, Christopher Massey. I'd like to preserve two minutes for rebuttal. That'll be granted. Consistent with your honor's text order, I plan to begin with the Supreme Court's decision in Ames, then move into the Supreme Court's decision in Students for Fair Admissions. To the extent that time permits, I'd like to address the district court's ruling on plaintiff's equal protection claim, as well as the 1981 claim. For years, courts applying the New Jersey law against discrimination and Title VII have applied the background circumstances test that McDonnell Douglas Step 1, requiring non-minority plaintiffs to prove that the employer is an unusual one that discriminates against the majority. Now, this court in Ida DeMarco, which is a Title VII reverse discrimination case, rejected the background circumstances test altogether. But nonetheless, the court... You're saying we were right. I think so. I think it's very clear that this court was right. But the Supreme Court in Ames swiftly did away with the background circumstances test because it's inconsistent with the language of Title VII in general, because Title VII does not distinguish between minority and non-minority. It only references individual, which was a pertinent factor, a motivating factor, for the court's decision in Ames. Have you seen the New Jersey Supreme Court addressing the background circumstances test since Harvard? Since Ames, you mean, Your Honor? Certainly not. No, I have not, but I didn't find any precedent that's available, again, consistent with Your Honor's text order. But I think that further discussion, this argument will lead to a different conclusion. Well, is this the kind of thing you think we ought to certify to the New Jersey Supreme Court to have them tell us what their law is? You could. You could certainly do that if Your Honor's believe that it's prudent. But given the New Jersey Court's reliance on federal courts' interpretation of anti-discriminatory statutes like Title VII, it's very fair to assume that the background circumstances test will no longer be applied going forward, because every law or every decision that the New Jersey courts base their opinion on has been now abrogated by Ames. So if Your Honor's do believe that it's prudent, certification... But it's not necessarily so, is it? I mean, it's a New Jersey statute, the NJLAD. Now, they've said they look to Title VII, but is it sort of ipso facto that they're going to have to change? Well, in Erickson, which is the Supreme Court's decision that adopts Ames, Erickson relies on the same cases, specifically the District Court of D.C.'s ruling in Parker, which the Sixth Circuit in Ames also relied on to form the basis and apply the background circumstances test. And then if you go forward in Bergen County or Bergen Community Bank v. Sisler, they also reaffirmed the application of the background circumstances test. But that case is very instructive as to the weight that New Jersey courts place on federal courts' interpretation. And they effectively ruled that the interpretation has to be consistent with the federal courts' interpretation of anti-discriminatory statutes for purposes of harmony. There's the statutory interpretation holding of Ames, and then there is, I think, an equal protection question that comes out of Justice Thomas' concurrence. And so I think there might be playing the joints, arguably, on the statutory interpretation question, although I think you've made the point that the offer detects any individual single statute. But what of the constitutional question, the equal protection question, whether this background circumstances test is consistent with the federal constitution? Well, the background circumstances test isn't consistent because the equal protection clause, Title VII, they draw no distinction between minorities and non-minorities. It only treats everyone as an individual under the law. So for that reason, the courts in Ames determined that it's violative of Title VII and should not be the law of the land any longer. Incidentally, as a footnote to this whole argument, we're very familiar with the record. So don't feel like we're, you know, we don't, we are well aware of the facts here. So thanks. We're just trying to figure out the, you know, to work out with you the law that ought to be applied to them. I do believe that if this court were to certify the issue to the Supreme Court, or the New Jersey Supreme Court, that the New Jersey Supreme Court would follow along with the court in Ames because everything, all the precedent that they rely on for the background circumstances test has been abrogated. So it's no longer valid good law. And to the extent that the courts want to adopt their own background circumstances test, they surely can obviously do that on their own. But I think it would be inconsistent with the precedent. Also, it would take longer, right? It would take longer. Now, with respect to the court's decision in students for fair admission, I believe that's pertinent to your Honor's evaluation based on, well, you know, I want to go back just one more point to Ames. In Ames, the court was also critical of the McDonnell-Douglas test itself, specifically step one, which obviously increased the burden under the background circumstance test for plaintiffs. But if you look to Chief Justice Roberts' concurrence, he was extremely critical of the McDonnell-Douglas test itself and found that it has no place at the summary judgment level because at step three of McDonnell-Douglas, it requires plaintiffs to prove by a preponderance of the evidence versus genuine dispute. We've read that and everybody can evaluate the merit of those But if you're a litigant in front of a district court in the District of New Jersey, I think it's tough, with one exception that I want to talk about, to take the position that the test shouldn't have applied, right? That the McDonnell-Douglas test shouldn't apply? Well, I would draw your Honor's attention to the decision of this court in E. DiMarco. And E. DiMarco, referenced earlier, is a Title VII case, reverse discrimination. And they apply in Title VII cases to McDonnell-Douglas. But if you look at that decision, nowhere in E. DiMarco did the court use the phrase or term preponderance of the evidence. And in conclusion in that case, this court actually determined that E. DiMarco established a genuine dispute of material fact, almost as if it anticipated Chief Justice Roberts' concurrence decades prior. I want to hone in on one piece of the record. And this is Defendant Deanna's deposition with the remark that I read as the fact that, quote, he's a minority was a part of the promotional decision. Do you regard that as direct or circumstantial evidence of discrimination? I would regard that as direct. And in this case, the decision makers all voted on the promotions. So the vote is, whoever has the majority vote gets promoted. And had Mr. Deanna not voted in line with his, what I'm arguing is prejudice, and he voted for Christopher Massey, there would have been a tie and the tiebreaker would have gone to the mayor. And the mayor had established in his testimony that Mr. Massey was clearly the superior candidate. If your position is that that's direct evidence of discrimination, did you argue below that McDonnell Douglas should not have applied based on trans world? I referenced the fact that direct evidence in my brief, direct evidence of would not require an analysis under McDonnell Douglas, but the court never got to McDonnell Douglas really in Judge Semper's decision because of the background circumstances. But had he applied? Well, I think he got to it. That's step one. There's, I think, the footnote in some language above the line about step two pre-tax. I don't think that it's that the district court didn't apply the framework. It just didn't come out your way. I think it would helpful when you come back up to point us to the spot on the record where you challenged the application of the framework altogether. Yes, Your Honor. And with respect to the students for fair admissions, I assume that it is of interest to Your Honors based on the affirmative action policy of the borough, if I'm not mistaken? Look, that's part of it. Okay. But I couldn't help but notice on page 14 of your reply brief, you say, you point out that essentially it doesn't matter. I'm going to quote your language. It said, the language only applies to BFPD police officer recruitment and hiring. That's the argument because the effective language of the policy seeks to attain and maintain a balance of police officers that's reflective of the community. So by operation... How would it work here then? Because this is not a hiring case. A promotion could not possibly affect... Or recruitment for that matter. Yeah. A promotion could not in any way affect the balance of police officers within the police department in Bergenfield. It would only apply to... So you're saying that this policy has nothing to do with your case? That's my argument. But the defense relies on the affirmative action policy as a basis for their decision. But... And I understood SFFA to be of interest based on their argument. And if we just look at SFFA, it's a Title VI case, but I think for purposes of time, the pertinent part of the decision would be Justice Gorsuch's concurring opinion. And he effectively asked the dissenting judges who had concurred in the earlier decision of Bostick, which expanded Title VII, to say, how can you have a outcome in this Title VI case and it not be the exact same in Title VII? Because in SFFA, the Harvard and UNC's admissions programs didn't pass strict scrutiny. And I would argue the same in this case. Now we can apply SFFA, but if this court were even to just do a strict scrutiny analysis on the actual affirmative action policy, it can't pass step one because there's no evidence of prior discrimination. And even if the defense relies on this consent decree that's referenced in the briefs, the consent decree, according to this court's decision in LOMAC, the city of Newark, it doesn't form a valid basis to establish a affirmative action policy unless the affirmative action policy, or excuse me, unless the consent decree actually requires the borough to institute an affirmative action policy. But even if you go to step two, it doesn't pass muster because it's not narrowly tailored. It goes on into perpetuity because it seeks to attain and maintain, which constitutes racial balancing, which the Supreme Court in SFFA found is unconstitutional on its face and would be evidence of racial discrimination in this case. Can you talk a little bit about the 1981 claim and your challenge to that? Yes. So in our 1981 claim, or in the decision of the district court, the court just essentially found that the 1981 claim wasn't valid. And we agreed in our briefing papers that, yeah, you can't file a 1981 claim against individuals, but you can file it against a municipality. In your separate 1983 claim, do you have a Monell component to that claim? In the complaint, no. There is not a 1983 Monell claim. However, you can still, this court has found that Monell and the evaluation of a Monell type claim under 1981 is effectively the same as under 1983. Well, I think 1983 is the enforcement mechanism for a Monell claim based on an equal protection argument. Yes. But 1981 claim is effectively the same, and it's evaluated in the same circumstances. If there's such a thing as a 1981 claim. And this court in McGreevy confirmed that. So it's evaluated the same exact way. And this case is more like a Pembauer case in that the policy makers for the borough are the ones who actually made the hiring decision or the promotion decision in this case. So that one act would constitute a policy under Pembauer and equally apply to the 1981 claim. How does McGovern play for you? Our McGovern opinion? It's a 1981. You're on off the top. Okay. That's okay. Okay. No problem. But I'd be happy to submit a briefing. Tony, everything. Okay. Thank you. We'll get you on your friend. Good morning. Morning. If it pleases the court, John Shedanian, Isabel Siddiqi, and Shedanian on behalf of all the defendants, I'm going to begin with, I think, the crux issue before the court, which was what the court started with Mr. Hastings, which is what should be done about the New Jersey Ladd higher standard for a non-minority plaintiff. And in light of the Ames decision, the, I think the court already hit the nail on the head that, that, well, let me, let me back up. I think there are two, there are two issues. I think we have Erickson and a clear pronouncement from the New Jersey Supreme Court in 1990. So we're going back 35 years ago, the New Jersey Supreme Court addressed this issue and, and it had never been addressed by the U.S. Supreme Court, only by the circuit courts. So the New Jersey Supreme Court, when they addressed it, looked at it, I think fairly carefully, went through the... So Ames boils down as a textual matter, looking at the federal statute and focusing on the phrase, any individual. That same term more than once appears in the New Jersey law. It does. And so what, what meaningful differences there that would lead us to conclude that the New Jersey Supreme Court would adhere to that test after Ames? So the New Jersey Supreme Court has repeatedly stated, and I think the court and be guided by title seven jurisprudence, but they don't follow it blindly. I understand that sort of background principles concept, but I just, there's, there's just a direct issue for you on same text. The Supreme Court says the federal text means one thing. And there's now a question for us about how the New Jersey Supreme Court post Ames would look at its statutory text. I don't think they're going to change it. I don't think, I don't think they changed their position. And I'll tell you why I don't think they changed their position. They will continue with their law as is? I believe they will. Okay. Because, because Ames specifically focused on title seven. It didn't focus on a constitutional argument. It simply said under title seven, we are no longer going to have the split in the circuits. But Justice Thomas was focused on a constitutional argument. He did make the footnote. Yes. And the footnote cites Harvard. Correct. And so again, we were called on in this case, at least one option is to predict under the Erie doctrine, how the Supreme, the New Jersey Supreme Court would react to all of that. And you have a test that assigns different meaning to the term, any individual than the Supreme Court has. How do you square the equal protection problem? How could the New Jersey Supreme Court be free to interpret that statute in a way that violates the federal constitution? Well, I don't think that they would be, I don't think, I think we're talking apples and oranges here if we're going there, because I don't think Ames talks about the constitution other than in Justice Thomas's concurrence. I'm not saying they're bound, but I'm saying there's a constitutional question presented by these claims that requires an interpretation of New Jersey law. And I'm concerned that your interpretation and the interpretation relied on by the district court violates the equal protection clause. And so I want to hear your position about why the New Jersey Supreme Court would be free to interpret the statute in a way that's inconsistent with the equal protection clause. I think they're going to look at it under a strict scrutiny standard. And if that's the standard that would be evaluated under. And I think that under that standard, you're going to get an analysis from the New Jersey Supreme Court, which has generally tended to be more liberal, if you would, with the employment laws in New Jersey, than the district courts and then the federal courts. We should interpret the constitution and anticipate how the New Jersey Supreme Court would interpret the constitution based on your views about their judicial philosophy. I don't think you should, I think you should certify, I mean, if that's an option, if the options are one, affirm Judge Semper, two, certify to the New Jersey Supreme Court and get their decision. Let them make the statement. Well, I think Judge Bovee is talking about something a little bit different. I don't think, you'll correct me if I'm wrong. We have the NJLAD. Okay, great. That's a New Jersey statute. But we're also talking about the equal protection clause. And is the New Jersey Supreme Court free to put its imprint on the equal protection clause when the United States Supreme Court is weighed in? Well, I think the answer to that is, Chief Judge Gereth, no, they're not. But I also think that the Supreme Court has not weighed in on that in a binding way, if you would. We have a footnote in a concurrence by Justice Thomas that mentions it. And I don't want to say it's a- I'll grant you that it's not, the Supreme Court is not binding us or the New Jersey Supreme Court, but the constitutional question is presented. We as a court are sometimes often, in fact, called on to make a constitutional call before the Supreme Court. That's what I think this case presents. And so I'm asking for your constitutional law response to defending the background circumstances test. What I'm hearing is that you believe that the standard is strict scrutiny, and you believe the test would survive strict scrutiny. I think it will, based on the language in Erickson, which talks about the one, there's only two things that will survive strict scrutiny in this arena, right? One of them is a systemic history of discrimination. Something to remedy a systemic history of discrimination. And that's exactly what this test is about, that higher test is about. That's an interesting point. So the test applies based on a distinction about who's in the majority, right? Well, the answer is- The background circumstances test applies by its terms based on a distinction about who's in the majority. Correct. And what's in the record about who's in the majority in this borough, or this county, or even New Jersey at this point, that would merit continuing to apply this test adopted in 1990 in 2024? Because we're not, and I'll say this, your honor, we're not looking at it in the limited window of the borough of Bergenfield. We're not looking at it in a limited window of Bergen County. We're not looking at it in the limited window of the state of New Jersey. When we look at- I mean, it's a New Jersey law test. In this law, with respect to that, we are. The way you would know that, that that is still the issue, if you would, that this test is necessary, is because if you look at the number of cases filed, we don't have a volume of reverse discrimination cases filed in New Jersey. Employment law cases, civil rights cases are the number two most commonly filed type of civil litigation. Wouldn't another inference from the lack of reverse discrimination cases be that most people are just following the law? Not if you look at the sheer number of employment cases filed. I want to talk a little bit about the affirmative action policy statement. Just walk us through your position about the significance of that and the inferences that you believe are available based on that policy statement. I don't think the affirmative action policy statement is really relevant or was relevant to Judge Schemper's decision. I think that it was- Is that what you argued below? Well, what we argued below was that it was part of the factual picture, if you would, in terms of what the borough has done to afford to be a non-discriminatory entity and a part of the factual history of this borough that had been subjected to a lawsuit from the NAACP and was subjected to a consent order from the NAACP which required it to go from a local hiring list to a tri-county hiring list in order to increase specifically the diversity of the police department. Opening up the pool is one thing. There's a reference in this policy to the use of, I think the term is ratios. There's another reference to selectively targeting certain groups. Do you think there's, if this case had gone to trial, there's an inference available that that's actually a memorialization of discriminatory intent? I don't think so because, again, I think it would be with respect to where the borough was in terms of its thought process, if you would, with hiring and what it was required to do as a result of its- But wasn't your position below that that policy statement reflects where the borough was in its thought process of hiring? Correct, and I think even under the Harvard case, using race as a plus factor is okay. I think that's what Harvard says. Harvard doesn't say, it says you can't have just a strictly race-based criteria for admission into the universities, but it says- Maintain a specific ratio? No, but you can, well, no, you can't have a specific ratio. I would agree with that. So the reference to ratio in that policy is problematic? I mean, I think the policy was such that it was part of that whole NAACP lawsuit at the time, and it was put in place as a result of that, which I think was one of the questions from the panel. And in fact, it was. I don't think that's in the record, but I know that it was. That ratio concept is mandated by the consent decree? No, no, the consent decree only mandated that we have a tri-county hiring. I'm not following you. So I think that all that was done in conjunction with the NAACP, I'll say at the time, that that consent order was entered into. But it didn't give the borough license to implement an unconstitutional hiring policy. Correct, and I don't believe that they have. Can I just ask you another question about, so did this policy come into the decision making at all in your view? Not with respect to Deputy Chief Massey, no, because it was only for hiring and for recruitment. So it was not an issue. But your friend brings up that you guys brought that up. Well, again, I think we brought up Chief Judge Chigares as part of the factual, to give the court the full factual picture of what was going on in the borough when the decisions were made over the number of years. Because if you recall in the historical context of this, Deputy Chief Massey wasn't passed over this time only. He was passed over previously, or he was not chosen previously. I don't say he was passed over. He was not chosen previously when there was a female candidate for chief who was picked. And again, I think that there is a, you know, this is now the second or third time that he's been not chosen, and that's why we wound up in this litigation. All right, okay. We talked with your friend about the he's a minority comment that's in the record. Do you dispute that that's direct evidence of discrimination? I do because I think it's taken out of context. I think that when the question was asked at the deposition of Councilman Deanna, what he was saying was one of the reasons that I chose him, which is, again, to me, and there was no exploration of that comment, was he said that he's a minority. I think what he was saying, again, this interpretation, you got to interpret it. And I sat through the depositions, is that he was saying that in addition to all of his other positive criteria, the fact that he's a minority and can affiliate more with the demographic of the borough makes that a plus for him. And don't you think that the fact that you just had to walk me through that explanation is one of the reasons that there's disputes of material fact here? You know, that's your inference from a comment that I think the word because is in the answer. So there is some inference of even causation in the promotional decision. Isn't that why we have trials? Well, Judge, it is, depending on what the issue is. So again, I think Judge Semper was correct under 1981. I think he was correct under 1983. And I think the court has addressed this briefly with the Monell issue, that there was no Monell pleading. There was no Monell argument by the plaintiff. We've demonstrated in the factual history that's been presented to both the district court and this court that there is a there is no policy, custom or practice of discriminating against Caucasian individuals. And in fact, the majority, the substantial majority of the of the leadership in the borough is white. You've proffered to us and proffered to the district court literally a, quote, policy statement. So it's difficult for me to square that affirmative action policy statement with your position that there's not even an argument. About a Monell claim here, it's memorialized. Well, but there's no argument from the plaintiff. The plaintiff didn't raise it. The plaintiff didn't contend it. Look, I think there's a fair dispute and a real question about whether that 1981 claim is viable. But I think if you look at the allegations made in that 1981 claim, I think you'll find Monell language. Respectfully, your honor, I disagree with that. I think the Monell claim was is the 1981 claim is pretty clear on that. But I think that goes back to your honor's point about whether there's a factual issue in dispute here and whether Judge Semper got it right below in granting the motion for summary judgment. The issues are, I think, very clear. I don't think there are factual issues in dispute. I think that the parties agree. Before you move too quickly, can I just, do you agree that Massey was qualified for the position? Yes. Okay. Was he more qualified than the person chosen? That's, that's not, that wasn't for me to decide that. And I don't think, I don't think that the, I think the answer is no. But I, but I personally, but that's my personal opinion. And I don't think that's relevant to the question. I think the question is whether the counsel felt that Massey was not as qualified as Mostafa Ravot. Okay. I had one thing that I spent entirely too much time on, and my law clerk as well. Here it is. Was there an answer in this case? I noticed that myself, your honor. Yeah, I, I, I couldn't find an answer. I, I, I wondered whether you might say, well, in docket number four, does that, does that constitute your answer? But then the district court after that said, hey, you guys got to file an answer. How does that matter here? I don't think an answer was ever filed in this case. And here we are on the Court of Appeals. Your honor, I, I don't know the answer to that question. Okay. None were unattended. All right. Okay. And similarly, when Mr. Massey submitted a responsive 56.1 statement, that went on address as well, correct? There's no paragraph by paragraph, admit, deny. In response on the summary judgment motion? I believe there was. I thought there was, your honor. I have to go back. I'd have to go back and look at the record again to see that. But I thought there was. Okay, thank you. Thank you, your honors. And I'll just briefly address some of the issues brought up in defense counsel's argument. Notably, as it's pertinent with respect to time, there was no response to our counter statement of material facts. So under, I think it's local rule 56.1, those arguably should be deemed admitted as a result of the failure to respond. And if that's the case, then there's clearly plaintiff has proven his case under McDonnell Douglas if those facts are all admitted. But with respect to- At least for purposes of summary judgment. Yes, your honor. Because that wouldn't go on into trial. Yep. However, with respect to the statement from Marte or Dijuana regarding he's a minority, that does constitute direct evidence of discrimination. And it doesn't matter if there are other reasons under McDonnell Douglas. It's only that it was a motivating factor. Because it was a motivating factor, it would constitute direct evidence of racial discrimination. And McDonnell Douglas wouldn't apply. And if we just break each defendant down, they all have a vote. And each vote carries weight. And it was a four to two decision in this case. So had he not used race as a basis for his decision, it would have been a three to three. And therefore, the mayor would have been the tie-breaking vote. And the mayor had testified that Massey was superior in every regard. And obviously, we can predict that he would have voted for Massey. And then just with respect to the court's interpretation of the background circumstances test going forward as it relates to the New Jersey Supreme Court, this would appear to be a clear violation of the Equal Protection Clause. Because again, it distinguishes between minority and non-minority. And it doesn't treat all individuals equally, which would be violative of the Equal Protection Clause itself. And that's all my time, your honors. And I appreciate it very much. All right. Thank you, counsel. We will take this case under advisement. And also, know that we are very familiar with the factual record here, even though we didn't talk about it a whole lot. So we will, again, take the case under advisement. Thank counsel for their excellent arguments, written and oral today. And we'll ask the court to adjourn. And then if we could meet with.